UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                     :

KEVIN WALKER                              :
                        Plaintiff,   :
                                       :          11 Civ. 9299 (JPO)
              -against-          :
                                       :       __MEMORANDUM AND__
DORA B. SCHRIRO, et al.,           :          __ORDER__
                      Defendants.  :
                                       :
-------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      This civil rights case, brought by Plaintiff Kevin Walker against a number of prison

officials, arises from a course of events that pivot around Plaintiff's efforts to obtain medically

authorized supportive footwear while incarcerated.  The Second Amended Complaint, filed *pro*

*se* and therefore interpreted to allege the strongest claims it suggests, alleges due process, equal

protection, First Amendment retaliation, access to courts, Eighth Amendment, and products

liability violations.  Defendants have moved to dismiss all claims.  For the reasons that follow,

this motion is granted in part and denied in part.

## I.     Background

      The facts stated in this background section are drawn from allegations made in Plaintiff's

Second Amended Complaint.  For purposes of this motion, these allegations are presumed to be

true.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).[1]

---

[1] Plaintiff filed his original complaint on December 16, 2011.  He filed an amended complaint on
June 6, 2012.  Defendants filed a motion to dismiss the amended complaint on August 30, 2012.
On November 20, 2012, the Court informed Plaintiff that he had until December 7, 2012 to file
opposition papers.  The Court added that Plaintiff "may also file on that date his proposed second
amended complaint, to which defendants may respond in their reply brief."  In their reply brief,
Defendants have asked the Court to reject Plaintiff's proposed second amended complaint.

On August 10, 2011, Plaintiff was placed in the New York City Department of Correction V.C.B.C. (also known as "the Boat").  While being processed into the facility, Plaintiff was informed by Defendant Daly that a prison order prevents inmates from wearing any personal footwear.  Plaintiff objected to Daly and explained that he has a medical condition that necessitates special footwear.  Specifically, Plaintiff requires custom sneakers with extra support, cushioned soles, ankle support, and special arch support.  In contrast, D.O.C. standard-issue sneakers lack these features.  Daly responded by telling Plaintiff to sign up for sick call.

On August 15, 2011, Plaintiff saw a doctor and explained this situation.  The doctor examined Plaintiff, determined that Plaintiff has flat feet and weighs over 350 pounds, and stated that if Plaintiff did not wear suitable sneakers he would experience pain and swelling in his feet and back.  Plaintiff returned to sick call several times due to extreme pain from his deficient footwear and was given Tylenol, even though he explained to the doctor that this medicine was inadequate.  The doctor indicated that Plaintiff would soon receive different pain medication.

On August 29, 2011, Plaintiff was moved to G.R.V.C. (known as "the Beacon").  He signed up for sick call and planned on seeing a foot and back specialist on September 6, 2011, but this never happened (for reasons unspecified in the Complaint) and Plaintiff remained in

---

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave" to amend the complaint "when justice so requires."  The principal reasons to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Here, there is no evidence of undue delay, bad faith, prejudice, or repeated failure to cure deficiencies.  The futility of amendment is a question best addressed by actually deciding the pending motion to dismiss.  Recognizing that the Court indicated that Plaintiff could file a proposed second amended complaint, and that the pleadings filed by *pro se* litigants merit "special solicitude," *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994), the Court therefore accepts Plaintiff's Second Amended Complaint ("the Complaint") as the operative pleading in the case.

"extreme pain."  The doctor continued to prescribe only Tylenol, even after indicating that Plaintiff would receive more effective medication.

On September 13, 2011, Plaintiff spoke with Dr. Pravin Nanjan, who indicated that the medicine had not arrived because the order had been placed incorrectly.  Ranjan prescribed Plaintiff stronger medication, provided permits for a double mattress to alleviate Plaintiff's severe back pain, and provided a permit for Plaintiff to wear his supportive sneakers.  Around this time, Plaintiff spoke with Defendant Washington, explained his situation and his receipt of a permit, and was informed by Washington that Plaintiff's wife could bring custom sneakers to the prison for Plaintiff.  Also around this time, Plaintiff learned from his wife that she had sent a pair of permissible sneakers and they had been returned—even though Plaintiff had never been notified of this package.  When Plaintiff asked Defendant Hart about this package, "in hopes that defendant would understand because she too is a big person," she "became very abusive and stated 'maybe your fatass need to loose [sic] weight and your feet would not bother you!'"

On September 17, 2011, Plaintiff's wife brought Plaintiff's custom sneakers.  Defendant Lespinasse prohibited Plaintiff from keeping the sneakers, adding that Washington had told her not to allow the sneakers.  She "laughed" when Plaintiff presented her with the medical permit.

Several days later, Plaintiff explained his situation to Defendants Lemon and Fraizer. Lemon stated that he would look into it, but that he had told the doctors to stop giving out permits for sneakers.  A week later, Lemon confirmed to Plaintiff that he told the doctors to stop issuing medical permits for prisoners and added that he "runs G.R.V.C., not the warden, not the doctors, me!  Deputy of security!"  Lemon and Frazier then discussed their desire to set a precedent that would prevent all inmates from obtaining medically prescribed footwear.  Lemon

added that Plaintiff could get his sneakers by offering information on what was happening in the jail, an offer that Plaintiff refused by telling Lemon "that he was losing his fucking mind!"

On September 19, 2011, Plaintiff asked Defendants Williams and Best for help with his footwear situation.  Williams called someone and then told Plaintiff that he had "pissed someone off" and "there was nothing he could do to help."  When Plaintiff spoke to Best, she replied that "nobody in this building (GRVC) get their personal footwear regardless of a medical or not, it's the building rules, if it's a problem we ship your ass out to another jail, its just that simple."

After these events, Plaintiff's unit was subjected to a routine search.  Harris arrived at his cell, explained that Plaintiff had "pissed somebody off," and, without any process known to Plaintiff, gave him a "green Id ICR card; ICR is the acronym for Inmate Contraband Receiver."  Harris cursed at Plaintiff and promised that Plaintiff would never get his custom footwear.  Receipt of an ICR card entails a number of onerous disciplinary consequences, including more extensive searches of an inmate's cell, prohibitions on work outside one's housing unit, and more thorough searches during visits by family.

Several days later, Plaintiff explained his medical and ICR situation to Defendant Garcia.  Garcia replied that nobody gets to wear special footwear and that corrections officers "do what we want."  Garcia reiterated that Plaintiff had "pissed someone off" and referred to prior litigation involving Plaintiff before Judge William H. Pauley of this District.

In the middle of October 2011, Defendant Anku and other officers searched Plaintiff's housing unit.  The inmates were told to get down on their knees.  Plaintiff told Anku that Plaintiff's medical condition would cause severe pain if he remained in that position; Anku replied by cursing at Plaintiff and emphasizing that he did not care about Plaintiff's medical condition.  This caused Plaintiff "extreme pain" for 30-45 minutes.

4

On October 17, 2011, Plaintiff was called to appear concerning his grievances against Lemon arising from denial of medically appropriate footwear notwithstanding a medical permit. Defendant Moultre told Plaintiff that his request for a hearing had been denied and that the grievance had been rejected. Moultre stated "I don't give a fuck about no medical." As they argued, Defendants Smith and Hines arrived. Plaintiff explained his footwear situation and medical permit. Smith replied that "we are setting standards throughout Rikers Island that in the Beacon (GRVC) nobody gets to wear their personal sneakers, regardless of a medical." Smith added that he would speak to Lemon about Plaintiff's concerns. Plaintiff returned to his cell and wrote to Defendant Agro about his problems.

Ten to twenty minutes later, Lemon came by and told Plaintiff that his subordinates would be dealing with the situation. Thirty minutes later, Plaintiff was "packed up and removed from the housing unit to a waiting bus to C-95." Plaintiff objected to non-defendant Captain Carter that he could not go to C-95; Carter replied that he had his orders. Upon arrival at C-95, Plaintiff explained to non-defendant C.O. Jacobs that he wasn't supposed to be on Rikers Island, "especially this building per O.S.I.U. (security)." Jacobs sent for security. Ten minutes later, Defendant Williams "came to the bullpens . . . and stated 'I know who the fuck you are, you got a lot of balls even coming in this building'!" At Williams' order, Plaintiff was confined to the intake bullpens for two days without food, shower, linen, running water, or a bathroom. Plaintiff believes this conduct was in retaliation for a civil rights lawsuit filed by Plaintiff in 2008 against Williams and several other guards. The next morning, Plaintiff's wife called security and spoke with Defendant Letizia, "who told her, 'don't worry we will take care of him and laughed.'" Plaintiff and his wife interpreted this as a threat.

On October 19, 2011, Plaintiff was moved to M.D.C., where the corrections personnel similarly refused to honor his medical permit.  At M.D.C., Plaintiff was told to see a foot specialist, but this appointment was cancelled because Plaintiff could not fit into any of the orange jumpsuits prerequisite to trips outside the prison facility.  Plaintiff grieved this situation several times, but has not yet been fitted for a jumpsuit.  Many of his medical appointments and physical therapy sessions have been cancelled as a result.

Plaintiff has seen two podiatrists, one at West Facility and one at M.D.C., both of whom agreed that he should wear supportive sneakers.  At this point, non-defendant Deputy of Security Colon stated that Plaintiff could wear custom sneakers only if they are "PUMA" brand.  Plaintiff's wife set out in search of suitable Puma brand sneakers and sent them to Plaintiff, but Plaintiff was denied access to the sneakers for 30-45 days while Colon inspected them.  In total, Plaintiff suffered 7-8 months of "extreme pain in [his] foot and ankles," and his lower back, with only Tylenol to alleviate this condition.

On March 28, 2012, Plaintiff was returned to the Boat.  Upon his arrival, Daly—who was not at the time a named defendant in this action—learned of Plaintiff's lawsuit and threatened Plaintiff, adding that he had "something" for Plaintiff upstairs.  Plaintiff immediately spoke to Defendant Morris and explained his fear of Daly's threat.  Morris replied "don't worry about it, just go to your housing area."  Even though his classification did not merit such treatment, Plaintiff was sent to a high classification housing unit.

The next morning, Plaintiff called the Inspector General office and reported Daly's threat.  He also called the Board of Corrections and filed a complaint.  At 2 p.m., Defendant Bacote arrived at Plaintiff's housing unit to discuss the matter.  At Becote's request, Plaintiff showed Becote the initial complaint in this case and noted where it mentioned Daly.  Becote told Plaintiff

6

and another inmate who had witnessed this whole course of events to remain by the officer station.  An hour later, Becote arrived with a team of officers clad in riot gear.  Plaintiff was handcuffed and taken to the intake bullpens, where he remained for five hours.

Non-defendant Captain Calise took statements from Plaintiff and the other inmate, and Plaintiff was then led by Morris to the medical clinic.  Upon leaving the clinic, Morris, Bacote, Daly, and two other officers "tried to take [P]laintiff in a secluded area by the elevators and [P]laintiff to walk in the area with all five (5) officers, which (3) are defendants."  Morris then ordered Plaintiff to "play the wall" while Daly applied tight handcuffs.  Plaintiff was returned to a high classification house, threatened by Bacote and Daly, and released from the handcuffs.

On April 2, 2012, Plaintiff was called to the security office and given a ticket by Bacote, who told Plaintiff to "shut the fuck up."  The next day, Bacote walked by Plaintiff in a threatening manner.  On April 5, 2012, Bacote and two other officers taunted and threatened Plaintiff in the housing unit.  The Warden of V.C.B.C. did not respond to Plaintiff's request that she intervene in this course of events.  Plaintiff received a ticket for disciplinary charges fabricated by Bacote.  At the hearing on this ticket, Bacote successfully urged the hearing officer to give Plaintiff the maximum penalty of forty days.  Plaintiff believes that throughout this period, Bacote, Morris, and Daly were retaliating against plaintiff.  In August 2012—several months after these events—Bacote continued to retaliate against Plaintiff by stealing his legal papers, breaking Plaintiff's personal glasses, arranging for repeated searches of Plaintiff's cell, threatening Plaintiff, and interfering with Plaintiff's personal mail.

Plaintiff reports that he remains in extreme pain due to improper footwear, that he has been rushed to Bellevue Hospital on one occasion because of swelling in his ankles, and that he is still taking Tylenol with codeine twice per day.  Plaintiff has sued Defendant Barker, the

7

supplier of standard inmate footwear to the New York City Department of Correction, for "failure to notify the public that the product that he is selling has not only a defect in the design but that it would cause serious injuries to those that wear it for an extended period of time . . . and that it is not suggested that these sneakers be [worn] for a specific period of time."  Plaintiff adds that Barker has failed to warn the public that his sneakers are not suitable for extended wear or for use by people who weigh a certain amount and have certain foot problems.

## II.    Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006) (quotations omitted).  That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted).

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citations omitted).  The pleadings filed by pro se litigants thus merit "special solicitude." *Ruotolo*, 28 F.3d at 8.

**III.      Discussion**

In the Complaint, Plaintiff identifies five causes of action: (1) violations of Plaintiff's due process and equal protection rights by Agro, Lemon, Fraizer, Garcia, Harris, and Schriro when Plaintiff was placed on ICR status without appropriate procedure; (2) retaliation against Plaintiff by Bacote, Morris, Daly, Garcia, Lemon, Harris, and Williams for filing a civil complaint and numerous grievances, retaliation against Plaintiff by Williams for Plaintiff's prior civil complaint before Judge Pauley, and retaliation against Plaintiff by Bacote for the filing of this civil action; (3) violations of Plaintiff's Eighth Amendment rights by Williams, who kept Plaintiff locked in the intake area for two days, and by Bacote, who forced Plaintiff to sleep in the intake area on a number of occasions while moving Plaintiff out of the building; (4) violations of Plaintiff's Eighth Amendment rights by Schriro, Agro, Lemon, Fraizer, Williams, Best, Smith, Garcia, Washington, Lespinasse, Hart, Hines, Aknu, and Moultrie through deliberate indifference to Plaintiff's need for medical treatment, and by Barker through deliberate indifference to the public's medical need in warning of design defects in his products; and (5) a products liability claim against Barker for design flaws and failure to warn.  The Court generally agrees with Plaintiff that the facts alleged in the Complaint are best interpreted as alleging this set of claims. However, in recognition of the special solicitude afforded to pro se litigants, the Court clarifies the doctrinal basis and appropriate defendants for some of Plaintiff's claims.

**A.      Due Process and Equal Protection**

Plaintiff alleges that he was assigned a "Green ID, ICR card" while at G.R.V.C. without proper procedure or an opportunity to contest that designation.  He adds that the defendants associated with the claim—Agro, Lemon, Fraizer, Garcia, Harris, and Schriro—acted in specific

disregard of standard disciplinary procedures.  He argues that these defendants thereby violated his due process and equal protection rights.  Neither claim succeeds.

To establish a due process claim with respect to a prison disciplinary proceeding, "a plaintiff must establish (1) possession of a liberty interest and (2) deprivation by defendants of that interest as a result of insufficient process."  *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 605 (S.D.N.Y. 2009).  "Prison discipline [does] implicate[] a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  However, "[t]he Supreme Court has stated . . . that prisoners do not have a liberty interest under the Federal Constitution in 'prisoner classifications and eligibility for rehabilitative programs in the federal system.'"  *Green v. Armstrong*, 189 F.3d 460, 460 (2d Cir. 1999) (quoting *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976)).  As Judge Castel has explained:

> In assessing whether a prison facility has afforded its inmates adequate procedural due process, courts acknowledge that prison administrators have wide discretion to adopt and execute policies and procedures that are in the best interest of the institution. Regarding classification procedures, prison officials have "full discretion" to control conditions of confinement, which include prisoner classification, and prisoners have no legitimate statutory or constitutional entitlement sufficient to invoke due process in connection with such conditions.  Consequently, prisoners have no liberty interest that protects them from security classification or mis-classification.

*Walker v. City of New York*, No. 11 Civ. 9611, 2012 WL 3037308, at *2 (S.D.N.Y. July 25, 2012) (quotation marks and citations omitted); *see also Taylor v. New York Dept. of Corr.*, No. 10 Civ. 3819, 2012 WL 2469856, at *3 (S.D.N.Y. June 27, 2012).  Because Plaintiff has failed to identify a liberty interest protected by the Due Process Clause, his claim cannot succeed.

Plaintiff's equal protection claim also fails.  The Second Circuit has explained that:

> To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender.  Such intentional discrimination can be demonstrated in several ways.  First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender.  In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion.  Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect.

*Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999) (citations omitted).  Here, Plaintiff does not allege that he was mistreated or treated differently than his colleagues on the basis of a protected classification.  He does not identify any law or policy as the source of the alleged violation, nor does he adequately allege discriminatory enforcement of any law or policy.  Thus, Plaintiff cannot prevail as a matter of law on any equal protection claim.

### B.      Retaliation and Access to Courts

Plaintiff alleges three distinct claims styled as "retaliation": the first claim focuses on actions by Bacote, Morris, Daly, Garcia, Lemon, Harris, and Williams against Plaintiff motivated by Plaintiff's filing of a civil complaint and numerous grievances; the second claim concerns actions taken by Williams and Letizia as punishment for Plaintiff's prior civil case before Judge Pauley; and the third claim focuses on actions taken by Bacote in response to Plaintiff's decision to file this civil action.[2]  The Court interprets Plaintiff's Complaint to raise claims under the First Amendment for retaliation and under the constitutional right of access to courts.

### 1.      First Amendment Retaliation

"[O]therwise constitutional acts may be actionable if taken in retaliation for the exercise of First Amendment rights."  *Soto v. Iacavino*, No. 01 Civ. 5850, 2003 WL 21281762 , at *2

---

[2] Plaintiff's prior case before Judge Pauley is denoted 1:08-cv-00284-WHP on ECF.

(S.D.N.Y. June 4, 2003).  To survive dismissal, "a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

It is well established that "a prisoner's filing of both lawsuits and administrative grievances is constitutionally protected."  *Collins v. Goord*, 438 F. Supp. 2d 399, 419 (S.D.N.Y. 2006) (citations omitted).  In other words, "[s]ince access to the courts is an established constitutional right," *Smith v. City of New York*, No. 03 Civ. 7576, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (citing *Bounds v. Smith*, 430 U.S. 817, 821 (1977)), speech undertaken for the purpose of accessing courts—extending from civil litigation to the administrative grievances ordinarily prerequisite to civil litigation under the Prison Litigation Reform Act—is "protected" for purposes of First Amendment retaliation analysis.

The adverse action inquiry is "objective" and is "tailored to the different circumstances in which retaliation claims arise."  *Dawes*, 239 F.3d at 493 (citation omitted).  "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."  *Dawes*, 239 F.3d at 493 (citations omitted).  "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection."  *Id.*  (citing *Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999) (per curiam)); *see also id.* ("Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." (citation omitted)).  Thus, "[u]nder

12

some circumstances, verbal threats may constitute adverse action, depending on their degree of

specificity and the context in which they are uttered . . . [but] vague intimations of some

unspecified harm generally will not rise to the level of adverse action for the purpose of a First

Amendment retaliation claim." *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007).

Courts also recognize a doctrine of retaliatory transfer.  As Judge Swain has explained:

> Prisoners normally have no constitutional right to remain in any
> particular state prison facility, absent a state statute or policy
> conditioning transfers on proof of specific acts of misconduct.
> Prison officials thus have broad discretion in making transfer
> determinations.  They may not, however, transfer [prisoners] solely
> in retaliation for the exercise of constitutional rights.  Where, as
> here, an adverse action (such as a transfer) is challenged as
> retaliatory in violation of the First and Fourteenth Amendments,
> the plaintiff has the burden in the first instance of demonstrating
> that the underlying conduct that precipitated the adverse action was
> constitutionally protected and that said conduct was a substantial
> or motivating factor in the defendant's subsequent adverse conduct.
> If the plaintiff meets that burden, the defendants have the
> opportunity to demonstrate by a preponderance of the evidence
> that they would have reached the same decision even in the
> absence of the protected conduct.

*Salahuddin v. Perez*, No. 99 Civ. 10431, 2006 WL 266574, at *5 (S.D.N.Y. Feb. 2, 2006)

(quotation marks and internal citations omitted).

The third and final requirement of a retaliation claim is a causal connection between the

protected speech and adverse action.  *Dawes*, 239 F.3d at 492.  "The causal connection must be

sufficient to support the inference 'that the speech played a substantial part in the employer's

adverse employment action.'"  *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000)

(quoting *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 780 (2d Cir. 1991)).  A

combination of direct and circumstantial evidence can support such an inference.  *Smith*, 2005

WL 1026551, *4.  Even at the motion to dismiss stage, "the inmate must allege more than his

13

personal belief that he is the victim of retaliation.  Conclusory allegations of retaliation are not

sufficient; the plaintiff must [allege facts] from which retaliation may plausibly be inferred."

*Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010) (quotation marks and

citations omitted).  In determining whether a causal connection exists between the plaintiff's

protected activity and a prison official's actions, courts may consider "(i) the temporal proximity

between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good

disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the

defendant concerning his motivation."  *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y.

2002) (citation omitted).

  "[P]rison officials have broad administrative and discretionary authority over the

institutions they manage."  *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (citation

omitted).  Accordingly, courts approach First Amendment retaliation claims brought by inmates

"with skepticism and particular care," since "virtually any adverse action taken against a prisoner

by a prison official—even those otherwise not rising to the level of a constitutional violation—

can be characterized as a constitutionally proscribed retaliatory act."  *Dawes*, 239 F.3d at 491.

  Here, Plaintiff alleges several different retaliation claims.  The Court addresses each in

turn, granting in part and denying in part Defendants' motion to dismiss.

  First, Plaintiff alleges that Letizia retaliated against him for his prior civil suit before

Judge Pauley.  Specifically, he alleges that Letizia mocked Plaintiff's wife with the promise that

"we will take care of [Plaintiff]."  Plaintiff adds that "I know this comment [referred] to the

treatment plaintiff was receiving in retaliation for the suit in 2008, in which defendant Williams

was a defendant with [several] of his colleagues also."  This claim fails even at the motion to

dismiss stage because Plaintiff has inadequately pleaded a connection between the protected

activity (his civil suit) and the adverse action (threatening Plaintiff while on the phone with
Plaintiff's wife).  This critical element is merely asserted, but none of the facts contained in the
Complaint adequately support it.  *See Crenshaw*, 681 F. Supp. 2d at 416.  Further, even if the
claim did not fail on this ground, the Court would still dismiss it due to the requirement of an
adverse action that rises above the threshold of a vague verbal threat.  *See Bumpus*, 495 F. Supp.
2d at 326 ("[V]ague intimations of some unspecified harm generally will not rise to the level of
adverse action for the purpose of a First Amendment retaliation claim.").

   Second, Plaintiff alleges that Garcia retaliated against him for his prior civil suit before
Judge Pauley.  The protected activity here is Plaintiff's prior civil suit.  The adverse action is
denial of supportive footwear notwithstanding a medical permit.  As the Court explains below,
this constitutes an independent constitutional violation—but that does not preclude it from doing
double-duty as the adverse action prerequisite to a finding of First Amendment retaliation.
Denial of medical care that could address "extreme pain" surely qualifies as an action "that
would deter a similarly situated individual of ordinary fitness from exercising his or her
constitutional rights."  *Dawes*, 239 F.3d at 493.  The causal connection is based on Plaintiff's
recollection that Garcia "stated that he was notified by an officer in the 3 building (GMDC) and
5 building (AMKC) that you were back in the system . . . and that you [were] involved in
something back in 2006, (a settled suit with Honorable William H. Pauley[]), and for us to put
you on ICR status.  Defendant Garcia stated that plaintiff pissed someone off, so, I can't help
you."  Plaintiff has adequately alleged the factual predicate of a causal connection between the
protected activity and the adverse action.  This claim therefore survives Defendants' motion to
dismiss.

Third, Plaintiff alleges that Lemon engineered a retaliatory transfer.  The protected activity for this claim is Plaintiff's filing of a grievance against Lemon for denial of medical care.  The adverse action is the transfer of Plaintiff at Lemon's instigation to C-95—a facility that Plaintiff immediately recognized as a dangerous location, as evidenced by his objections to Carter that "I could not go to C-95."  Plaintiff explains that C-95 was "the same facility that defendant Lemon threaten[ed] to send plaintiff if he don't leave it alone (obtaining his supportive footwear) even though defendant Lemon knew that a few officers tried to have physical injury done to plaintiff."  The causal connection is based on this explicit threat by Lemon, coupled with the fact that Plaintiff filed a grievance against Lemon (thereby not "leav[ing] it alone") and the fact that Lemon "told plaintiff that his underlings will be dealing with me."  Applying the standard that Judge Swain articulated in *Salahuddin*, which includes the proviso that prison officials may not transfer prisoners "solely in retaliation for the exercise of constitutional rights," 2006 WL 266574, at *5 (citations omitted), the Court concludes that Plaintiff's claim of retaliatory transfer survives this motion to dismiss.

Fourth, Plaintiff alleges that Williams locked him in an intake area without food, water, showers, linens, running water, or a bathroom as retaliation for Plaintiff's 2008 civil case against Williams.  The protected activity is Plaintiff's prior civil case.  The adverse action is Williams' decision to confine Plaintiff to an intake area without basic necessities for two days.  The causal connection is based on Williams' statement that "I know who the fuck you are, you got a lot of balls coming to this building!"  This claim survives Defendants' motion to dismiss.

Finally, Plaintiff alleges that Becote, Morris, and Daly threatened him in several ways on and after March 28, 2012, and that Bacote gave Plaintiff a ticket without any other justification that resulted in Plaintiff being punished for 40 days.  The protected activity is Plaintiff's decision

16

to litigate this case.  The adverse actions consist of verbal and physical threats and a handcuffing

by Becote, Morris, and Daly, as well as the forty days of punishment that resulted from Becote's

trumped-up charges.  The causal connection is based on the facts that Daly learned of this case

and told Plaintiff that Daly had "something" for Plaintiff upstairs, that Becote reviewed the

initial complaint in this case after Plaintiff complained of Daly's threat, and that Daly and Becote

(joined by Morris) commenced their allegedly adverse actions almost immediately afterwards.  A

retaliation claim based on the threats and handcuffing described by Plaintiff cannot succeed

because these actions do not rise to the level of severity prerequisite to a finding of adverse

action.  Thus, the retaliation claim against Daly, Morris, and Becote based on their threats and

handcuffing must be dismissed.  However, forty days of punishment for a charge fabricated to

punish an inmate for filing a civil lawsuit does qualify as an adverse action under retaliation

doctrine.[3]  Given that Plaintiff also described facts that support a finding of causal connection,

Defendants' motion to dismiss the retaliation claim against Becote arising from the ticketing

incident is denied.

     In sum, Plaintiff's retaliation claims against Garcia, Lemon, Williams, and Becote

survive this motion to dismiss.  All other retaliation claims are dismissed.

### 2.    Access to Courts

     "It is well established that all persons enjoy a constitutional right of access to the courts,

although the source of this right has been variously located in the First Amendment right to

---

[3] Defendants argue that Plaintiff should be required specifically to allege that he did not engage in the behavior charged by the ticket.  In the Second Amended Complaint, however, Plaintiff plainly states that "Up until that point plaintiff have not had one single problem that would warrant a misbehavior report, nor have plaintiff ever refused to lock-in."  He adds that "both charges [were] fabricated by defendant Bacote."  These facts, taken as true for purposes of this motion, negate Defendants' argument.

petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments." *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997) (collecting cases). "The right of access to courts extends beyond mere physical access to a courtroom and a judge." *Id.* "Prisoners must have a 'reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Smith*, 2005 WL 1026551, at *6 (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)). Thus, the active interference of prison officials in the preparation, filing, or exchange of legal documents may constitute denial of access to the courts. *See Lewis v. Casey*, 518 U.S. 343, 350 (1996).

"In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.*, took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." *Monsky*, 127 F.3d at 247 (quotation marks and citations omitted). "Interference with legal mail implicates a prison inmate's rights to access to the courts . . . [t]o state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quotation marks and citations omitted); *see also id.* ("In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment.") (citations omitted)). Accordingly, "[i]n balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (collecting cases).

"To state a valid § 1983 claim that he has been denied reasonable access to the courts, [an inmate] must show that the alleged deprivation actually interfered with his access to the courts or

18

prejudiced an existing action." *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995);

*see also Davis*, 320 F.3d at 352 ("[Plaintiff] fails to state a constitutional claim for violating his

right to send and receive legal mail because he alleges neither the establishment of an ongoing

practice by prison officials of interfering with his mail nor any harm suffered by him from the

tampering.").  "A delay in being able to work on one's legal action or communicate with the

courts does not rise to the level of a constitutional violation."  Jermosen, 877 F. Supp. at 871.

"In other words the plaintiff must show that a non-frivolous legal claim had been frustrated or

was being impeded due to the actions of prison officials."  *Cancel v. Goord*, No. 00 Civ. 2042,

2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citations omitted); *see also Smith*, 2005 WL

1026551, at *6; *Bartley v. Artuz*, No. 95 Civ. 10161, 1999 WL 942425, at *9 (S.D.N.Y. Oct. 19,

1999).

Plaintiff alleges at multiple points that certain defendants interfered with his mail,

including his legal mail, and took action against him in retaliation for his grievances and civil

lawsuits (including this suit).[4]  Most of Plaintiff's legal claims arising from this course of events

are covered by First Amendment retaliation doctrine.  Regardless, because Plaintiff has not

alleged facts that reveal a substantial delay or interruption in his ability to communicate with the

Court, and has not alleged facts that could support a finding that he has been prejudiced or

impeded in his legal actions, Defendants' motion to dismiss must be granted as to any access to

court claim suggested by the Complaint.  *See Cancel*, 2001 WL 303713, at *4.

### C.      Eighth Amendment

---

[4] Plaintiff's opposition to the motion to dismiss the First Amended Complaint contains additional facts of this sort, some of which are addressed by Defendants in their filings.  Those allegations are not considered in this opinion, which addresses only the now-operative Second Amended Complaint and Defendants' motion to dismiss.

The Eighth Amendment to the U.S. Constitution provides that "cruel and unusual punishments [shall not be] inflicted."  U.S. Const. amend. VIII.  That rule, applicable to the states through the Fourteenth Amendment, *see Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976), is violated by unnecessary and wanton inflictions of pain and suffering, *see Whitley v. Albers*, 475 U.S. 312, 320 (1986).

Plaintiff alleges Eighth Amendment violations under two distinct theories: inadequate medical treatment and unconstitutional conditions of confinement.[5]  In 1976, the Supreme Court explained that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Estelle*, 429 U.S. at 104-05 (quotation marks and internal citations omitted).  The Court has since clarified that "we see no significant distinction between

---

[5] The Complaint also suggests an instance of tight handcuffing by Daly while Morris ordered Plaintiff to "play the wall" after Plaintiff's visit to the medical clinic.  To the extent that Plaintiff alleges an Eighth Amendment excessive force claim based on this incident, that claim does not succeed on these facts.  As this Court has noted:

> [S]ome degree of injury is ordinarily required to state a claim of excessive use of force in violation of the Eighth Amendment.  A plaintiff need not prove significant injury to make out an excessive force claim, but a *de minimis* use of force will rarely suffice to state a constitutional claim.  *De minimis* force, even if clearly unpleasant to endure, does not violate the Eighth Amendment where the use of force is not of a sort repugnant to the conscience of mankind.

*Taylor v. New York Dept. of Corr.*, No. 10 Civ. 3819, 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012); *see also id.* at *3-5 (discussing Eighth Amendment excessive force doctrine).  Here, Plaintiff does not allege any serious injury, nor does he allege that he protested that the handcuffs were too tight or that the officers acted abusively.  *Cf. Sachs v. Cantwell*, No. 10 Civ. 1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012) (discussing the legal standard for excessive force claims under the Fourth Amendment for claims based on tight handcuffing).

claims alleging inadequate medical care and those alleging inadequate conditions of confinement

. . . . Whether one characterizes the treatment received by [the prisoner] as inhumane conditions

of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate

to apply the deliberate indifference standard articulated in *Estelle.*" *Wilson v. Seiter*, 501 U.S.

294, 303 (1991) (quotation marks and citations omitted).

   To state an Eighth Amendment claim, a prisoner must allege both (1) that he suffered a

sufficiently, objectively serious deprivation and (2) that officials who caused the harm acted or

failed to act with a sufficiently culpable state of mind, *i.e.*, with deliberate indifference to inmate

health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

   The objective prong of this analysis requires an assessment of the allegedly cruel and

unusual conditions. "[T]he Constitution does not mandate comfortable prisons." *Rhodes v.*

*Chapman*, 452 U.S. 337, 349 (1981). However, prisoners may not be deprived of "basic human

needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*,

509 U.S. 25, 32 (1993). "Nor may prison officials expose prisoners to conditions that 'pose an

unreasonable risk of serious damage to [their] future health.'" *Phelps v. Kapnolas*, 308 F.3d 180,

185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35). "Ultimately, to establish the objective

element of an Eight Amendment claim, a prisoner must prove that the conditions of his

confinement violate contemporary standards of decency." *Id.* (citations omitted); *see also Carr*

*v. Canty*, No. 10 Civ. 3829, 2012 WL 3578742, at *3 (S.D.N.Y. Aug. 16, 2012) ("[T]o establish

the deprivation of a basic human need such as reasonable safety, an inmate must show actual or

imminent harm." (quotation marks and citations omitted)).

   "To establish the second element, deliberate indifference, a plaintiff must show

something more than mere negligence . . . ." *Id.* (internal quotation marks and citation omitted).

An official cannot be found liable on a conditions of confinement theory "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  The Second Circuit has noted that "[t]his deliberate indifference element is equivalent to the familiar standard of recklessness as used in criminal law." *Phelps v. Kapnolas*, 308 F.3d at 186 (quotation marks omitted).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Plaintiff's conditions of confinement claims against Williams and Bacote for confining him in intake areas do not succeed.  Plaintiff's claim against Williams is based on the fact that Plaintiff was confined to an intake bullpen for two days and denied access to food, shower, linens, running water, and a bathroom.  Plaintiff's claim against Bacote is based on the fact that, on the 5-7 occasions that Plaintiff was moved out of V.C.B.C. at Bacote's command, Plaintiff was forced to sleep in an intake area with "a constant air-condition system" that blew "extreme cold air" onto Plaintiff, who lacked blankets, sheets, running water, and a toilet.

Addressed individually, none of these conditions suffices to state an Eighth Amendment violation.  It is well established that deprivation of food, *see Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983), denial of toilet paper and toiletries, *see Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003), exposure to the bitter cold, *see Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001), exposure to the cold without bed linens, *see Maguire v. Coughlin*, 901 F. Supp. 101, 105 (N.D.N.Y. 1995), and confinement in a cell without a toilet, *see LaReau v. MacDougall*, 473

22

F.2d 974, 977 (2d Cir. 1972), can result in an Eighth Amendment violation when severe enough

or sustained over a long enough period of time.  Moreover,

> [s]ome conditions of confinement may establish an Eighth
> Amendment violation "in combination" when each would not do
> so alone, but only when they have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such
> as food, warmth, or exercise-for example, a low cell temperature at
> night combined with a failure to issue blankets.

*Wilson*, 501 U.S. at 304 (citations omitted).  In this case, however, the Court cannot conclude

that the deprivations that Plaintiff experienced rise to the level of cruel and unusual punishment.

This determination hinges largely on the fact that none of Plaintiff's confinements in the intake

areas lasted more than two days.  Given that none of these deprivations rose to an acute and

conscience-shocking level, either alone or in combination, the relative brevity of Plaintiff's

mistreatment precludes a finding that Plaintiff can satisfy the requirement of an objectively

serious deprivation.

The Court reaches a different conclusion, however, with respect to Plaintiff's claim based

on denial of medical care.  At this early stage in the case, drawing all inferences in Plaintiff's

favor, the Court concludes that Plaintiff has sufficiently alleged a serious medical need.

It is well established that not every claim made by a prisoner that he has not received

adequate medical treatment states a violation of the Eighth Amendment; neither negligence nor

medical malpractice is sufficient.  *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).  To the

contrary, a plaintiff must show conduct that is "repugnant to the conscience" or "incompatible

with the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102, 105 (citations omitted).[6]

      Defendants cite a number of cases that have rejected Eighth Amendment claims based on denial of footwear. Most of these cases are off-point or address the issue only with stray lines of *obiter dictum*. While the Court agrees that the legal principles articulated by these cases would defeat a conditions of confinement claim in this case based on shoddy footwear, it parts ways from Defendants on the significance of these cases for Plaintiff's denial of medical care claim.[7]

---

[6] Moreover, inmates are not entitled to the medical treatment of their choice. *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." (citation omitted)); *see also Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).

[7] Nearly all of the cases cited by Defendants either address this point in brief dicta or discuss only a conditions of confinement claim where the plaintiff lacked a medical condition, medically advised footwear, or prescription medication. In *Edwards v. Quinones*, Judge Pauley held that a plaintiff could not satisfy the deliberate indifference element—and then added in a single sentence of dicta that the plaintiff, who had not alleged such facts as medical need, prescribed painkillers, or extreme pain, "[bore] the hallmarks of a recreational litigant." No. 10 Civ. 3141, 2010 WL 4669110, at *1, *3 (S.D.N.Y. Nov. 17, 2010). *Walker v. Clemson*, presented by Defendants as their principal case, similarly misses the mark. No. 11 Civ. 9623, 2012 WL 2335865 (S.D.N.Y. June 20, 2012) *report and recommendation adopted*, No. 11 Civ. 9623, 2012 WL 3714449 (S.D.N.Y. Aug. 28, 2012). In *Walker*, the plaintiff was denied use of personal sneakers even after a doctor recommended that he be provided with supportive footwear to remedy a foot spur; this injury, coupled with the prison-issued sneakers, caused the plaintiff "to suffer pain, chronic fungus, [and] a painful gait which in turn warranted the use of a cane to correct" and resulted in a possible need for surgery. *Id.* at *1. Magistrate Judge Cott recommended denial of a conditions of confinement claim based on deprivation of basic human needs, noting that "[w]hile the prison-issued footwear may not have been as supportive as [the plaintiff's] personal sneakers, the Constitution does not require that prisons provide high-quality footwear." *Id.* at *4. However, when Judge Cott turned to the plaintiff's separate claim of inadequate medical care, he concluded that an absence of information about "how much time passed from [] the date Walker was seen by the facility doctor, to the date his personal sneakers were returned to him" prevented any "determination from the pleadings as to the particular risk of harm faced by Walker due to the alleged deprivation." *Id.* at *6. Judge Cott nonetheless recommended denial of the plaintiff's claim due to failure to satisfy the deliberate indifference

24

Although these claims are analyzed under the same doctrinal framework, the presence of a medical treatment issue calls upon the Court to assess with particularity the nature and quality of the medical deprivation that Plaintiff endured.  As the Second Circuit has explained,

> if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain.

*Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citations omitted).  While this standard most certainly includes "condition[s] of urgency that may produce death, degeneration, or extreme pain,"  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citation omitted), it has also been interpreted to include "less serious denials [of medical attention] which cause or perpetuate pain."  *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003).  Thus, courts "will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain."  *Id.*  Accordingly, when presented with denial of medical treatment claims, courts do not "require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."  *See id.* (disagreeing with

---

requirement.  *Id.*  Several of Defendants' other citations fare little better because Defendants rely on cases that deal with ordinary conditions of confinement claims, not denial of medical care claims.  *See, e.g.*, *Martin v. City of New York*, No. 11 Civ. 600, 2012 WL 1392648, at *9 (S.D.N.Y. Apr. 20, 2012) (finding no Eighth Amendment violation where inmate slipped and fell on a wet shower floor while wearing poorly constructed shoes); *Williams v. Dep't of Corr.*, No. 11 Civ. 1515, 2011 WL 3962596, at *4 (S.D.N.Y. Sept. 7, 2011) (denying conditions of confinement claim where poorly constructed shoes caused slip and falls, and pain in inmate's calves and feet).

district court determination that chronic pain somewhere between 'annoying' and 'extreme' could not suffice to support a denial of treatment violation under the Eighth Amendment).

Here, Plaintiff states that he experienced months of "extreme pain," including intense pain in his feet, severely swollen ankles, and chronic bouts of lower back pain, as the direct result of Defendants' allegedly malicious refusal to allow him access to supportive footwear. These symptoms, he reports, resulted in a visit to the hospital to examine his swollen ankles and difficulties engaging in certain prerequisites to prison life, such as "playing the wall" and kneeling on the ground during a search.  Significantly, this situation persisted despite several recommendations from prison physicians that Plaintiff be allowed to wear supportive footwear, despite official permits from these physicians, and despite the fact that Plaintiff was prescribed painkillers to deal with the pain that resulted from non-treatment.  Plaintiff is thus differently situated than the plaintiffs in other cases that lacked medical advice and medical prescriptions.[8]

While "[i]t is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," *Chance*, 143 F.3d at 702-03 (citations omitted), the Court concludes that this claim must survive Defendants' motion to dismiss.  Plaintiff has described a form of near-chronic suffering that, by his own account, far exceeds the threshold of merely annoying and rises to the level of extreme pain. *Brock*, 315 F.3d at 163.  Notably, physicians found this condition "worthy of comment" and treatment—namely, prescription painkillers and medical permits—and Plaintiff has explained

---

[8] Further, unlike cases where courts addressed somewhat analogous facts with the precision made possible by fully developed factual records, this Court can rely only on the pleadings. *Cf. Cole v. Scully*, No. 93 Civ. 2066, 1995 WL 231250, at *3 (S.D.N.Y. Apr. 18, 1995)

that this condition "significantly affects [his] daily activities."  *See Salahuddin*, 467 F.3d at 280.

While this case is in some respects a close one, the Court cannot conclude as a matter of law that

Plaintiff's injuries fall below the relevant threshold of objective severity for purposes of an

Eighth Amendment denial of medical treatment claim.  The settled fact that "the Constitution

does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349, simply does not mean that the

Eighth Amendment abides the wanton infliction of months of "extreme" pain through the

allegedly arbitrary denial of medically authorized footwear by prison guards.  Recalling that

"[m]obility is fundamental to our continued health," the Court concludes that "discovery could

shed light on whether Plaintiff's medical need was of such seriousness and urgency that the

failure to address it . . . amounted to a violation of Plaintiff's constitutional rights."  *Giambalvo*

*v. Sommer*, No. 10 Civ. 6774, 2012 WL 4471532, at *5 (S.D.N.Y. Sept. 19, 2012).[9]

   Because Defendants have not moved to dismiss these claims on any ground other than

Plaintiff's supposed failure to demonstrate a sufficiently serious deprivation, the Court does not

examine whether Plaintiff satisfies the other requirements of a denial of medical treatment claim

(including the requirement of a culpable mental state on Defendants' part).

---

[9] Defendants argue that this claim must be dismissed on the basis of a single Inmate Grievance Form (IGF) from October 12, 2011, which Defendants argue is incorporated into the Complaint by reference.  Even assuming that this IGF is, in fact, incorporated by reference, it would not constitute a basis to dismiss the Complaint.  This form states that, as a resolution of Plaintiff's grievance, "the [Inmate Grievance Resolution Committee] was informed that if your medical note is current, you are advised to bring your medical note to the clothes box and you will be issued supportive footwear."  The IGF indicates that Plaintiff refused to sign.  Nothing about this document plainly contradicts Plaintiff's own account of events.  It is entirely possible that the Committee took that permissive position in response to his grievance, but that Defendants nonetheless maliciously and willfully disregarded that instruction from the Committee.  The fact that Plaintiff refused to sign the form says little on its own; it certainly does not contradict Plaintiff's allegations that Defendants denied him access to his supportive footwear notwithstanding a medical permit, nor does it prove that Plaintiff actually received supportive footwear.

In the Complaint, Plaintiff identifies Schriro, Agro, Lemon, Fraizer, Williams, Best, Smith, Garcia, Washington, Lespinasse, Hart, Hines, Anku, and Moultrie as the defendants associated with the deliberate indifference claim.  Because the Complaint was filed by a *pro se* litigant, it must be interpreted to raise the strongest claims it suggests against the set of named defendants.  The Court has independently examined the Complaint and concludes that Plaintiff's Eighth Amendment claim is alleged against Hart, Lespinasse, Washington, Lemon, Fraizer, Best, Williams, Harris, Garcia, Moultre, Smith, and Hines.  For the reason set forth *infra*, Plaintiff's claims against Schriro and Agro are dismissed for failure adequately to allege their supervisory liability.  Further, Plaintiff's allegations against Aknu involve only conditions of confinement; to wit, being required to kneel uncomfortably for 30-45 minutes during a search.  Because the Complaint does not allege that Aknu participated in the denial of Plaintiff's request for medical treatment, the Eighth Amendment claim against him must be dismissed.

### D.   Claims Against Defendants Schriro and Agro

"It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted."  *McCoy v. Goord*, 255 F. Supp. 2d 233, 258 (S.D.N.Y. 2003) (quotation marks and citations omitted).  Under § 1983, supervisory liability "depends on a showing of some personal responsibility, and cannot rest on *respondeat superior.*"  *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citing *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)).  "[P]roof of 'linkage in the prison chain of command' is insufficient."  *Id.* (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).  "Absent some personal involvement by [an official] in the allegedly unlawful conduct of his subordinates," he cannot be liable under section 1983.  *Gill v. Mooney*, 824 F.2d 192, 196 (2d

28

Cir. 1987); *see also Hernandez*, 341 F.3d at 145 (specifying some of the forms of involvement that would support supervisory liability).  A defendant's status as warden or commissioner of a prison, standing alone, is thus insufficient to support a finding of supervisory liability.  *See Collins*, 438 F. Supp. 2d at 420.  Further, merely "affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983."  *Manley v. Mazzuca,* No. 01 Civ. 5178, 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007).  "Broad, conclusory allegations that a high-ranking defendant was informed of an incident are also insufficient."  *Gonzalez v. Sarreck*, No. 08 Civ. 3661, 2011 WL 5051341, at *14 (S.D.N.Y. Oct. 24, 2011) (citation omitted).

Applying these rules, the Court concludes that Plaintiff has not alleged facts that could support a finding of supervisory liability against Agro and Schriro.  All claims against these defendants are therefore dismissed.

### E.    Claims Against Barker

Plaintiff alleges that Barker violated the Eighth Amendment by virtue of deliberate indifference to the public's medical needs and that Barker should be held liable under the tort law doctrine of products liability for defective design and failure to warn.  These claims do not succeed.  As a provider of shoes to the prison, Barker could not plausibly be described as one of the officials acting under color of law "who caused the harm" or did so with the requisite state of mind—namely, deliberate indifference.  *See Farmer*, 511 U.S. at 834.  This defeats any Eighth Amendment claim against him.  Plaintiff has not alleged and this Court cannot imagine any other claim under § 1983 against Barker.  Thus, there is no federal claim in this case against Barker.

Absent such a federal claim, this Court could only consider a state law products liability claim against Baker as a matter of supplemental jurisdiction.  Given the early stage of this

litigation and the markedly distinct nature of the state law claims as compared to Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the varied products liability claims alleged in the Complaint.  *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 102-03 (2d Cir. 1998) (noting that "when all federal claims are eliminated in the early stages of the litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice").

      All claims against Barker are therefore dismissed.

## IV.    Summary of Remaining Claims

      All claims in this case are dismissed except for First Amendment retaliation claims against Garcia, Lemon, Williams, and Becote, and Eighth Amendment denial of medical treatment claims against Hart, Lespinasse, Washington, Lemon, Fraizer, Best, Williams, Harris, Garcia, Moultre, Smith, and Hines.

## V.    Conclusion

      For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  The Clerk of Court is directed to close the motion at Dkt. No. 32.

SO ORDERED.

Dated: New York, New York
      March 26, 2013

_____
J. PAUL OETKEN
United States District Judge